All right. Our fifth case for this morning is the United States against Viren. Ms. Pollack. Thank you. May it please the Court and Mr. Baum. Elizabeth Pollack of the Federal Defender's Office on behalf of the appellant Shane Viren. Just as an initial note, we had briefed the issue of whether or not the increased mandatory minimum should apply to Mr. Viren based on the nature of his prior conduct. Obviously, the Lockhart decision has made that a no-go. We understand. So we are focusing on the first and the third issues in our brief this morning. The first issue is whether or not the district court abused its discretion in rejecting an 11C1C agreement that would have subjected Mr. Viren to a maximum sentence of 30 years of imprisonment for the conduct in this case. And fundamentally, what you have is when the court took the plea, the plea, obviously the agreement, contained a provision that stated that it was up to the district court whether to accept or reject the agreement. If the agreement were rejected, then Mr. Viren would have the chance to withdraw his plea and begin negotiations anew. And they showed up for sentencing four months after the plea was taken. The district court had noted that she would wait to see the pre-sentence report before making a final decision about the accepting or rejecting of the plea agreement. She did. When the pre-sentence report came out, she decided to reject the 11C1C agreement. But she never said why. Well, I mean, that's your position, I understand. The government kind of gave us the context of this around page five and six of its brief. And obviously, the critical thing about the C1C agreements is the agreement on the sentence. And she says at the time of the plea hearing, if I want to sentence you to more than 30 years, I'll give you the chance to withdraw. They say yes, we understand. And then I'll totally agree with you, this is not the most fulsome explanation I've ever heard. But she says, I will not accept the 360-month cap. So that tells me that it's the sentence cap that she's disagreeing with, and I'm not sure what else there is to say about it. Well, the point, though, is that when you're rejecting a plea agreement on that basis, and sure, she says she won't take the cap. But particularly when you're looking at the Crouse case, the judge in that case said the same thing, except with more. And in that case, the judge said, I think the sentence is too low given the nature of the conduct. I reviewed the pre-sentence report. I have these problems with the pre-sentence report. I'm going to reject the agreement. That is the type of context. But do you have to say all of that, though? Well, I think you do. I think you do, and I think that's what the case law requires. Because when you're talking about the rejection of a plea agreement, what this court has said, that when you reject a plea agreement, the reasons for that rejection can then be used by the parties to engage in further plea negotiations, to make decisions about what they're going to do. So what is it about knowing that it's the cap? Obviously, you know, the conduct is the conduct. Right. But it's the cap on the sentence. So if the parties wanted to go back to the drawing board and try for another C1C, which I think actually get really particular scrutiny because they're the exception to the rule of the district court's discretion over sentencing, maybe they'd negotiate a 480-month cap. I don't know what they would do, but they know what they're doing. That's exactly right. But they don't know that, though, because the question, and even in Krauss, the case that I cited quite frequently, it states that, you know, are you going to reject any cap? Is it just this cap? Do you not want to see a cap? Is there a particular sentence that, you know, they could work towards, for example? And Your Honor's exactly right. If you're talking about renegotiating a C1C agreement, there are a plethora of possibilities for what the parties could have negotiated here. They could have done another C1C with a higher cap. They could have negotiated for a range of months of imprisonment within the C1C agreement, as we sometimes see. There's many different things they could have attempted to do. And you could see from the transcript that counsel was kind of surprised and didn't know how to behave after it was rejected. She gave them a recess to discuss it. He said, I'm not. We're thrown off here. We need more time. And then they have this open plea that happens because, you know, all the district court said was, I don't like the cap. Didn't the district court say, Ms. Pollack, I received a pre-sentence report, along with the addendum. I reviewed it. And I'm notifying the parties that I'm rejecting the terms of the plea agreement. Then goes on to say, I will accept the free ‑‑ I mean, the way the record is now is a semicolon. Right. And I will not accept the 300. Isn't it pretty implicit that it's whatever the facts contained in the pre-sentence report is what pushed it? I suppose you could infer that, but that's not what the court's burden is. So when this court is reviewing an exercise of discretion, it has to be flat‑out stated what is that district court ‑‑ what's the reasoning. And the case law states that there has to be an explanation of the rejection, so not only to encourage meaningful appellate review, but also so the parties are as best informed as they can be about how to proceed from that point forward. So what the government ‑‑ If she had just said, look, I think this sentence is 360 months is too short. I mean, that's how I read what she said. 360 months is too short. She hadn't come to rest on where she wanted to be. But I don't know how much more she needs to say. I actually, like Judge Flom, think the fact that she acknowledges she's read the pre-sentence report does tell you something. There's a lot of things in the pre-sentence report, which actually sort of coincides with my next point, which is that the criminal history category was incorrectly decided. But to that prejudice? I mean, maybe I'm jumping ahead. Well, we kind of are, but they're intertwined. And the reason that they're intertwined is because the government has said that it doesn't change the guidelines range, so it's harmless error because the range was going to stay the same. But I would posit that even though it's not clear, she didn't say much on the record about her consideration of the criminal history category except to say that he had a history which disturbed her. But that being said, anybody who is familiar with federal sentencing guidelines, judges, lawyers alike, who see a Chapter 4 enhancement in a pre-sentence report. I mean, my first thought is obviously, well, that's a bad dude. You know, because we've got 4B1.5, ACC is 4B1.4, career offender 4B1.1. If you get into the Chapter 4 career enhancements, they are labeled as a more serious offender than anyone else because of their history. And in this particular case, 4B1.5 is repeat and dangerous sex offender against minors. And anybody who sees that is automatically going to trigger something in their mind. This is an extremely serious case. Now, the conduct in and of itself was serious. But that being said, there's no way to tell that that Chapter 4 enhancement didn't somehow influence the decision-making. And when the court specifically says— Boy, that's hard for me to actually swallow. Given what the judge knew about what Mr. Viren had done, I can't believe that seeing 4B1.5 triggered something in Judge Darrow's head that wasn't already triggered by the record. But he was a Category 2 without that, with one conviction. With a life imprisonment range, though, right? True. It was true. But she wasn't inclined to give him a life imprisonment range as indicated by the sentence she actually ended up giving him. She could have stacked the sentences consecutively and chose not to do so. So I think that when you have a 4B1.5 enhancement with someone who otherwise has a single conviction as a Category 2, and she says on the record, I have looked at that pre-sentence report that has influenced my decision, it could be the factual basis, it could be the criminal history, it could be personal facts about him that are in the emotional characteristics section or the personal history characteristics section. We don't know because that pre-sentence report is 25 pages long. It has a lot of information in it. They're all of the above. What's that? They're all of the above. Or maybe. That's the thing. There's no way to know. You have to say something. There's no way to tell. She did. Well, she said, I don't like the cap. But that's not sufficient. You have to explain why you don't like the cap and reference the pre-sentence report. It's too short. That's her view. She didn't like the cap because it was too high? Well, no. I think what would have been more helpful is to reference the particular facts about the pre-sentence report that led her to that decision so that another plea agreement, if the parties could have, could have been renegotiated at that point. But what's she going to say? I mean, you know, this guy has engaged in some,  engaged in some of the worst behavior in this category of crime that I've ever seen. I mean, as a judge, but not as a prosecutor. Not as a prosecutor. And she did reference, I'm giving you a minor break. Understood. Well, I see that I'm into my time here, but I did want to clarify the request for relief because reading over the briefs today, it looked a little unclear to me exactly what I'm asking for. What I'm asking for is for the court to remand and vacate the open plea and the sentence and send it back, reinstate the 11C1C agreement and give the court, if the court wants to make an adequate explanation, that would allow for appellate review of the decision why you're rejecting that plea agreement. And then if she does again reject it, then give the parties a sufficient time or sufficient indication so that a different plea agreement could be attempted. Because let's be fair, there's a lot of space between 30 years and 50 years. Maybe she would have taken 40. Maybe she would have taken 35. Maybe she would have now, after all these Thompson cases, rebalanced supervised release, put him on life supervised release. There's a bunch of different options here. And he's 43. So he's going to be in prison until he's dead. And this is the difference between maybe breathing on the outside and maybe not. So let her make the appropriate explanation. And if she still rejects the 30 years, then we can try to work out a different agreement. Okay. Thank you. Welcome back, Mr. Boehm. Thank you, Your Honor. May it please the court, counsel. This court has said that when you're rejecting a C1C agreement, you shouldn't give a lot of editorial comments. Because otherwise, you're going to start engaging in the plea negotiations. We think that Judge Darrow was crystal clear in rejecting the cap of 360, that it was too low. I can't think of another reason why you would say I'm rejecting the cap of 360 unless you thought it was too low. And even the remedy that's now asked for is to go back and let her give more reasons. If you take into account now what she said at the sentencing, it is crystal clear that she thought it was too low. And, in fact, asked the AUSA, why are you still recommending 30 years, a substantial departure from the life guideline range? So we think that Judge Darrow's rejection of this C1C should be affirmed without question. And we do think it is harmless error. Whether he was a Category 2, a Category 1, a Category 6, she was very troubled by his history, his conduct, and I don't think... So he's up at the 43 offense level no matter what? I believe he's actually at a 45 above... Well, he was higher, but it goes down, right? Correct, but under any criminal history category, that's a life guideline range, so we don't... there's no harmful error. Probably too short anyway. She wanted to make sure that this defendant did not hurt anyone the way he had before, and we think that the judgment of the district court should be affirmed. Thank you. Thank you. If you'd like one final... I think you maybe don't have a full minute, but I'll give you a full minute. Thank you. Mr. Baum's point is that if you take a look at what happened at the sentencing hearing, her reasoning becomes clear, and I think the case law is clear that that kind of bootstrapping is not permitted. What is required is at the time of the plea being rejected, the reasons have to be given. What she was doing at the sentencing was going through the 3553A factors and describing the justification for her chosen sentence to then imply backwards that that's what she was thinking at the time. We don't get to know that officially, but the fact is is that by not saying that at the time of the rejection of the plea, the ability to renegotiate a plea that would have been more favorable than the ultimate result was taken away from the defendant. And so to take what happened at sentencing and infer back is not the proper procedure. It needs to be rejected at the time. The explanation needs to be given at the time of the rejection, not later. And I made just a brief point in my reply that if that's the government's position and they think it's useless for a remand, then just give us another judge. And somebody else can do the review of the C1C and reject it based on their reasoning, and that would be an appropriate result. That's what we'd ask for. All right. Thank you very much. Thanks to the government as well. We will take the case under advisement.